## <u>Important Privacy Notice</u>

Federal Rule of Civil Procedure 5.2 prohibits litigants in a non-habeas proceeding from submitting documents that contain personal information. Unless the Court orders otherwise, <u>personal identifying information in Court filings must be limited as follows</u>:

• Social security numbers, taxpayer-identification numbers, and financial **account numbers must include only the last four digits** (e.g., xxx-xx-1234)

• Birth dates must **include the year of birth only** (e.g., xx/xx/2000)

• Names of persons under the age of 18 must be indicated by **initials only** (e.g., A.B.)

You are responsible for protecting the privacy of this information in your filings. If your documents, including attachments, contain any information that does not comply with this rule, please black out that information before sending your documents to the Court.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

Julia Kardosh _____

_____

_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

- against -

Chester County and the municipality of west Goshen ___

_____

_____

_____

_____

_____

_____

_____

_____

_____

*(In the space above enter the full name(s) of the defendant(s). If you
cannot fit the names of all of the defendants in the space provided,
please write "see attached" in the space above and attach an
additional sheet of paper with the full list of names. The names
listed in the above caption must be identical to those contained in
Part I. Addresses should not be included here.)*

**COMPLAINT**

Jury Trial:  ☐ Yes    ☐ No

(check one)

**I.    Parties in this complaint:**

A.    List your name, address and telephone number.  If you are presently in custody, include your identification
       number and the name and address of your current place of confinement.  Do the same for any additional
       plaintiffs named.  Attach additional sheets of paper as necessary.

| Plaintiff | | |
|---|---|---|
| | Name | Julia Kardosh |
| | Street Address | 233 starboard way |
| | County, City | mount Laurel, NJ |
| | State & Zip Code | NJ 08054 |
| | Telephone Number | 609-472-4409 |

*Rev. 10/2009*

B.    List all defendants.  You should state the full name of the defendants, even if that defendant is a government agency, an organization, a corporation, or an individual.  Include the address where each defendant can be served.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  Attach additional sheets of paper as necessary.

Defendant No. 1

Name    Chris Pawlowski

Street Address    501 W market Street

County, City    West chester

State & Zip Code    Pa 19382

Defendant No. 2

Name    Alita Rovito

Street Address    501 W market Street

County, City    West chester

State & Zip Code    Pa 19382

Defendant No. 3

Name    Debra Ryan

Street Address    501 W market Street

County, City    West chester

State & Zip Code    Pa 19382

Defendant No. 4

Name    Mincarelli

Street Address    501 W market Street

County, City    West chester

State & Zip Code    Pa 19382

## II.    Basis for Jurisdiction:

Federal courts are courts of limited jurisdiction. Only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C.  § 1332, a case in which a citizen of one state sues a citizen of another state and the amount in damages is more than $75,000 is a diversity of citizenship case.

A.    What is the basis for federal court jurisdiction? *(check all that apply)*
      Q  Federal Questions          Q  Diversity of Citizenship

B.    If the basis for jurisdiction is Federal Question, what federal Constitutional, statutory or treaty right is at issue?    1983 claim and due process violation

C.      If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party?

Plaintiff(s) state(s) of citizenship _____

Defendant(s) state(s) of citizenship _____

**III.    Statement of Claim:**

State as briefly as possible the facts of your case.  Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A.      Where did the events giving rise to your claim(s) occur? _____

_____

B.      What date and approximate time did the events giving rise to your claim(s) occur? _____

_____

_____

C.      Facts:  The court had violated mother's 4,5,14th amendment rights, due process and denied my right to appeal.

An expired instant field drug test that I did not consent to was used to justify removing my children for what is now 13 months and denied me a trial.  All legal and physical fustyfh were removed from both partrbyd simultaneously and the following day a PFA was granted where no abuse is alleged and the plaintiff literally testified there was never abuse if threats/ and it was still granted and made a final order 2 weeks later because of the results of the insensible drug test that desoutf me vehemently contesting the results the court threw away and never sent out for confusion testinv and literally deniability got going to averheskth to hsvd another test conducted even though she had paid them previously and was nd dr refunded.

Chris Pawowsky head of adult probation
Judge Mincsrelli
judge Rovito
judge Ryan
There are transcripts and judges orders that show what happened. .

[box: What happened to you?]

[box: Who did what?]

[box: Was anyone else involved?]

[box: Who else saw what happened?]

**IV.    Injuries:**

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received. _____

I have lost my ability to have my toddlers.  My daughter was nursing when this began and she is in kindergarten now.  My other daughter was in preschool  and now she's in the 3rd grade.  To get back those years I don't know  mother in the world who wouldn't pay every penny they had.  The stress caused serious health effects on me. Heart damage, I was fired from a job the day after I was hired due to the false PFA being granted. My expungement hearing  I waited 17 years for was canceled due to the PFA. I lost my home all of my money and my children..  What  more can someone have taken from them?  I almost died from stress in 2021 my body shut down.  There is no amount of money that will ever makeup for what has been taken from me.

**V.    Relief:**

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking, and the basis for such compensation.

_____
_____
I am seeking
1) the return of my children immediately
2) $500,000 award for damages
3) $500,000 for each of my children as they are victims as well.
4) to make it clear that instant urine drug tests  can not be used against someone in court without confirmation testing
5) a formal apology from the county court

6) for the laws regarding grandparents rights to be modified to explicitly determine the difference between 5324 and 5325 in terms of awarding custody.

7) the court to allow the lawsuit against my firmer attorney legal malpractice to be allowed to be heard for the reasons provided in oral argument.

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this __1st__ day of ___November___ , 20 __24__

Signature of Plaintiff _____

Mailing Address ___233 starboard way___

___Mount laurel, NJ___

___08054___

Telephone Number ___609-472-4409___

Fax Number *(if you have one)* _____

E-mail Address ___JuliaKardosh@icloud.com___

<u>Note</u>:    All plaintiffs named in the caption of the complaint must date and sign the complaint. Prisoners must also provide their inmate numbers, present place of confinement, and address.

<u>For Prisoners</u>:

I declare under penalty of perjury that on this _____ day of _____, 20_____, I am delivering this complaint to prison authorities to be mailed to the Clerk's Office of the United States District Court for the Eastern District of Pennsylvania.

Signature of Plaintiff: _____

Inmate Number _____

The court has taken my children from both parents for over a year despite no cause or admissible evidence and given them to a third party right commending dependency proceedings.  The court denied the right to speak in 2022
Thd court continues to deny parents rights including saying they have months to counsel or visitation. With their children.  The court has covered up the unethical acts of colleagues by denying preliminary injections from ever being granted s city date and then awarding legal fees to the third party.  The court has stated the cats r is fur to an inadmissible instant expired drug test that mother never consented to anc had no chain of custody.
Further I vehemently contested the results and the court threw away this urine screen and never sent it out for confirmation testing.  I  spent thousands if dollars in authenticated testing and the court has  evaluations and the court refused my authenticated tests with chain of custody.  Although I asked how kver s test to be given a reunification plan the court ignored me.  My pleadings have disappeared after being f life and going 6 months later of not at all.  My appeal "lost" and then denied as being untimely.  I have had my chilly taken for 3 years and the court has refusued to report the evidence of ethics violations that they are obligated to report. despite me raidingonjdcyiks anc a formal motion to strike the inadmissible drug test the city denied this, denied me my children and continued the truck that I have been denied legal counsel for for the 3rd time and hsd related it will not heed the preliminaryh injections

Julia Kardosh- pro sec
233 Starboard Way
Mount Laurel, NJ 08054
484-796-1695

Plaintiff: Julia Kardosh
Defendant: The Municipality of West Chester

### Complaint: Illegal laws and policies resulting in a civil rights violation

Here comes Julia Kardosh, Plaintiff filing a complaint against Chester County for intentional tort.

Venue:

Plaintiff has an open custody case in Chester County Court and all events and matters included in this complaint occurred within the municipality of Chester County, therefore jurisdiction and venue are with Chester County Court.

The venue and jurisdiction  is proper as all violations of civil rights have occurred due to Chester County's Municipality is the defendant

History:

In 2020 Joseph Henderson, "father" in above captioned case, filed a complaint for custody.  Plaintiff hired Cheryl McCallin, to represent her.  McCallin, however,  solely worked against Plaintiff's interests while retained and worked for the interests of the party who was paying her, the now intervenors in the custody case.  Despite irrefutable evidence presented in numerous filings with the court, the court has gone through extreme lengths to ignore the illegal actions of maternal Grandparents to the degree that would lead one to believe is fueled by corruption.  This included Cherly McCallin filing a Motion for continuance less than a week after Plaintiff retained her, a motion that Plaintiff can prove was never shown to her and its existence is denied by Ms. McCallin to this day. The grandparents who funded Cherly McCallin had planned, without Plaintiff's knowledge and against her interests, to intervene in custody.   As Ms. McCallin relayed to Plaintiff, she was unavailable due to vacation plans to represent Plaintiff, and she referred Plaintiff to Laura Baker to represent her in the event that the continence was not granted.  Ms. McCallin wrote the reason for continuance was the grandparents intended to intervene in custody and as Plaintiff can prove with the voicemail Cheryl McCallin left Mother on September 30th, 2020, 6 weeks later, Plaintiff was not privy to this information and was lied to by her counsel working for and paid by intervenors. This was done without Plaintiff, the client, ever being made aware for over a year.  An opposing party, the father, showed this to Mother and Mother has a photo

1

holding the motion for continuance.  That is the only copy Plaintiff has ever been provided and it was done so over a year after it was filed.  Because McCallin relayed to the judge that Grandparents intended to intervene, honorable Judge Platt ordered psychological evaluation on the parents- the sole reason for doing so.  Although it came back saying there were no concerns for Mother to safely parents, the mere fact it was ordered was used against the parents at the petition to intervene.   This was clearly meant to prejudice a judge who saw through McCallin and refused to grant legal custody to her at the intervention.  Although the ordered evaluation had no concerns over her ability to parent, the fact it was ordered was then used as the only claim on the petition to intervene that is not a blatant act of perjury however its an invalid claim.  Plaintiff has proven through email correspondences between maternal grandparents, "intervenors" and Laura Baker engaged in unethical communications and exchanges including Intervenors writing Mothers custody proposal which Mother vehemently disagreed with.   This correspondence proves grossly unethical conduct and a clear conflict of interest, however this has been ignored by the court despite the preponderance of evidence provided. Additionally, Cheryl McCallin refused to take Plaintiff's calls when the grandmother demanded Plaintiff's signature on October 20th to sign a conflict waiver while grandmother claimed she would lose the kids due to a psych eval.  For a conflict waiver to be valid, one must give "informed consent" and Cherly McCallin not taking any of mothers calls while grandmother called and told her not to take Plaintiff's calls and they exchanged emails when Plaintiff was attempting to call, proves that Ms. McCallin purposefully did not inform Plaintiff of anything and therefore Plaintiff could not give informed consent.  It is a lawyer's duty to perform this task, however Cherly McCallin, despite being retained for Plaintiff for two months, billing client for 3 months of service, filing something as her counsel (which she never provided her a copy of), she then claims that she never billed for any services and she never filed anything  on Plaintiff s behalf.  These are both unquestionable lies and proven in Plaintiff's evidence.  Grandparents had plotted to intervene in custody from prior to Father even filing a complaint, and the slew of egregious unethical actions, corruption, error of law, and abuse of discretion has occurred in this case ever since.

Plaintiff avers that she was lied to regarding the nature of the intervention and what it actually meant and her rights.  As shown in the response filed by her attorney, she was led to believe that grandparents had "de facto: custody merely by Plaintiff living in their home for 2 months when they filed to intervene.  Plaintiff vehemently objected to this as shown through text messages and emails however she was instructed that she had to agree to this, or it would have a negative impact on her custody case.  On Dec 10th, 2020, the court allowed the grandparents to intervene under 5325 solely by Plaintiff's agreement which Plaintiff can prove she was lied to the legal grounds and what it entailed.

The 20-page transcript reveals that at no time did the grandparents ever even argue

2

5324.

Custody Pleadings and Third Parties

Pa.R.C.P. No. 1915.3(e) and Pa.R.C.P. No. 1915.15(a) require pleadings by third parties to set forth the factual basis for standing:

(e) Pleading Facts Establishing Standing.

(1) An individual seeking physical or legal custody of a child, who is in loco parentis to the child, shall plead facts establishing standing under 23 Pa.C.S. § 5324(2) in Paragraph 9(a) of the complaint in Pa.R.C.P. No. 1915.15(a).

**(3) An individual seeking physical or legal custody of a child, who is not in loco parentis to the child, shall plead facts establishing standing under 23 Pa.C.S. § 5324(4) and (5) in Paragraph 9(c) of the complaint in Pa.R.C.P. No. 1915.15(a).**

**It is without question that Grandparents failed to do so.**

Jan 14th, 2021, 36 days later, a custody conciliation hearing took place (via video because of the Covid 19 pandemic restrictions.)  After reading the response submitted for conciliation, Plaintiff relayed she did not agree with what was submitted in her name as she did not agree the grandparents should be entered on the custody order in any capacity.  Laura Baker, paid for by grandparents, informed Plaintiff 1) that grandparents already had "de facto custody" so there was no point in arguing they didn't and 2) that her response was already submitted (Plaintiff had signed blank verification forms) and could not be altered. Laura Baker had told her to meet in her office before the hearing and said she would have the opportunity to tell the conciliator this. At conciliation, the video feed went out 5 minutes into the hearing and was out for almost the entire hearing, it came back on when Keith Boggess was signing the order at the end.  Cheryl McCallin put the laptop down to pick up a paper and it was revealed that Cherly McCallin was sitting next to the conciliator "teaching him" how to do his job as he had just started.  This is highly unethical for a magnitude of reasons.

The order came out granting legal custody to grandparents however the court has only granted the grandparents the right to intervene under 5325 and that statute for 5324 was never argued, let alone granted.

Father filed for trial shortly after and Grandparents stopped paying for Plaintiff's legal counsel.  Plaintiff was dumped onto an attorney who had just passed the bar, never tried a case, and at the time of the hearing both attorney discussed with the court that it was unfair for the clients to have this trial due to the fact that if Plaintiff was dissatisfied with the result, she would legally be entitled to a rehearing due to ineffective counsel.

Father's attorney filed a motion of limine to oppose the grandparent's intervention as they had no right to legal custody and were never granted it at the intervention hearing.

The Judge made it clear that she did not feel that the grandparents should remain on this order and attempted to resolve the issue at hand by suggesting that a family counselor meet with parents and after 60 days they have a review hearting.  As Plaintiff could not afford the therapist, the court also included grandparents onto this.  Parents agreed.  Due to Father drinking problems and a report that was solely based on the fact the grandparents stole the therapist at Plaintiff was going to move back into father's house a compete lie- the court determined the that the grandparents should remain on the order.

Father filed preliminary objections.  Grandparents went against the custody order the very first week and took the kids during Plaintiff's time.  Plaintiff went on the computer that she was told she could use (Grandmother stole of all Plaintiff's money and refused to use it to buy Plaintiff a computer and said she could use theirs instead.).  Plaintiff discovered evidence of blatant and planned collusion between her attorneys and Grandparents.  From the very first day Plaintiff hired McCallin, Grandmother was emailing McCallin building her case to intervene. A plan that was alluded to in 2019 by Grandfather when he got angry.  Mother had lied to and coerced into agreeing to the 5325-visitation status SOLEY because she was told (as her response to the complaint in custody repeats FIVE times) that they had "de facto" custody, a complete lie.  Mother's attorney was privately emailing the grandparents about taking custody and how to go about doing so from the very were.  After two continuances a trial was to be held in June, however as mentioned previously, Mother's counsel was seen as incompetent to the degree the lawyers felt that it was a waste of their client's time.  Judge Platt was very clear in court that day that she did not believe the grandparents should be on the custody order.  Father filed preliminary objections and Motion of limine to the grandparents legal standing in custody, which should have been heard that day but instead, after the court reassured the parents that this would be cleared up and the grandparents would "go back to being grandparents"  at the review hearing in 75 days after ALL parties were ordered to go to family therapy which Mother said would be completely unproductive as Father was drinking heavily and was irrational and irate and shoud not have been subjected to family therapist with the grandparents.  Kelly Hockenberry, the family therapist, was misled by the grandparent behind Mother's back, again, that Mother was going to move back in with Father. Because of this, Kelly Hockenberry held Mother accountable for father's actions as shew was led to believe she was moving back in with Father and Father was a complete disaster.  Ultimately Father ended up with criminal charges for the things he said to Mother regarding the grandparents and Mother was ordered by the therapist toto come up with a custody agreement with Father where he threatened her and yelled at her and refused to agree to anything, Mother endured this abuse for weeks, and within 45 days she had shingles and a tumor in her blood vessels from the stress of what she had to endure.

The court kept grandparents on the order solely due to Fathers actions and provided a custody order that is not even legal when designating delineated custody times between parties living under the same roof.   An illegal order that the intervenors were not found in contempt of violating.  The grandparents immediately broke the very first weekend and continued to for the next 2 years all while Mother's money was stolen, she was left in $12,000 of debt, legal aid refused to provide counsel as no actions were pending, and an illegal custody order remained in place.

## History beginning August 2023

In August 2023, Plaintiff filed a special relief petition after her children were taken out of the state by Grandparents and their whereabouts not disclosed for seven days.  This third-degree felony was ignored by the police who said it was a custody matter and Plaintiff, was directed to file in family court. Plaintiff did file a special relief on or about August 19th, 2023.

In retaliation the intervenors, whom Plaintiff avers were illegitimately placed on a custody order, did not respond to Plaintiff's petition for special relief and instead filed a counter petition for special relief along with a motion to modify custody.  At this time, 3 years had not past since the last order, so technically a motion to modify was not permissible.

Chester county Rules of civil procedure state that emergency hearings are to be filed in the form a petition for special relief.  Any emergency petition shall be heard before a judge. The Court instead removed Plaintiff's case and placed this before a court master against the rules of Chester County civil procedure. Plaintiff was not advised beforehand that this was going to be heard by a conciliator, as the court notice did not contain who would be presiding over the matter, as is customary.  Because of that omission, Plaintiff was not able to contest the court master involvement and have the matter heard before a judge, which is more appropriate and is her right.

At this hearing, Plaintiff's filed original petition for special relief as well as her response to the counter petition for special relief by the Intervenors and a response to the emergency motion to modify custody all of which were missing from the court master's folder at the hearing that a court master cannot rule on any of the 3 petitions/ motions to be heard that day.  Plaintiff's files were all missing from the court master's folder at the time of the hearing and both parents were given under 20 minutes after opposing counsel bright in over 50 pages of authenticated and what Plaintiff proved was fabricated, "evidence."   Additionally, the only matters alleged were toward Plaintiff being on drugs and fathers house being messy.  Without requesting a drug test or a mental health evaluation or a home assessment, the court removed all legal and physical custody from both parents.

Custody of children can not be taken from a parent without either

 1) dependency proceedings commencing
 2) consent of a parent

Unless natural parents' prima facie right to custody is successfully overcome via **dependency proceedings,** **the Superior Court cannot confer standing upon third parties to interfere with the parent/child relationship.** *(Cardamone v. Elshoff, 659 A.2d 575, 442 Pa.Super. 263, Super.1995. Child Custody)*


The county is required to provide a parent with counsel if it removes custody from both parents.  As dependency proceedings were required to remove the children from both parents.  Children were removed from both parents simultaneously even though no incident occurred, and parents separated 4 years ago.

The county court did not provide any counsel to either of the unrepresented parents.  Additionally, Plaintiffs timely filed response to the grandparent's special relief were missing from the court master's folder entirely and he refused to go retrieve it, so Plaintiff's argument was never heard.  Plaintiff and Father were given under 10 min each to argue a case.  Without requesting any drug and alcohol testing or mental health evaluation then court master removed all physical and legal custody from both parents.  The court order also did not include a reunification plan in addition to not ordering any drug testing, order a psychological evaluation on either parent, or provide a hearing date to reconvene in 30 days which is required when the court removes children from parent's care especially when they never had gained any legitimate custody to begin with.

Plaintiff and Father each filed a motion to stay.  The court date was provided for Dec 2023.  Plaintiff went to get the children to exercise her custody time however Grandparents attorney, being somehow unaware what a stay order meant, advised them to not let Plaintiff leave "at all costs" and they physically assaulted her and barricaded her car in the driveway. This was admitted in court later.  Grandparents called the police.  Grandparents provided the police a letter written by Jennifer Fink's (Mary Ellen and William's new attorney after McCallin dropped them as clients to cover his misconduct) as an email that stated that grandparents had custody and forced Plaintiff to vacate and escorted her away in front of her children. Plaintiff contacted Father who overheard the entire ordeal of Plaintiff begin barricaded in the driveway, falsely imprisoned and her car keys attempted to be stolen by Grandparents.   Plaintiff was escorted off the property and then drove to then police station and after 3 hours, the DA determined that the letter Ms. Fink provided was inaccurate and confirms it was Plaintiff's custody time and Plaintiff gets a single hour left with her kids.  It is the last hour she will get for over a year. The stay order is moved from December to October 5th which was in 4 days from when it was rescheduled.   Plaintiff filed a continuance as she can not afford counsel and Legal aid could not do an intake for almost 4 weeks.  This was scheduled for October 6th, the day after the hearing.  The continuance is denied, no phone call is provided as Plaintiff's requested.

**Events that prove grounds for civil rights violation of the municipality.
Municipal policies contrary to law that have resulted in several civil rights
violations County unconstitutional and wrongful practices:**

1) On October 5th, 2023, Plaintiff agreed to drug testing through a third-party facility
Averhealth.  After Plaintiff paid for her drug test, the court administrator stated
that Plaintiff needed to go to adult probation after Averhealth explained to court
admin they do not issue instant urine screens due to their admissibility in court.
2) Plaintiff never consented to probation administering a test.
3) Plaintiff was threatened by the court that the court would take her children if she
did not provide a urine screen in court.
4) Plaintiff overheard the court admin ask adult probation if "any old drug tests
kicking around in the back" as she later learned adult probation no longer
administers any drug tests and has not since prior to Covid making the test over
4 years old and expired. Adult probation took Plaintiff's license and disappeared
for three hours.  Court had already reconvened when someone came up able to
administer a urine screen.
5) Adult probation administered an instant urine screen
   a. Plaintiff was handed an open unsealed cup without a lid
   b. The test was processed not within sight of Plaintiff
   c. Plaintiff's prescribed medication came back negative, and Plaintiff tested
   positive for methamphetamine
   d. Plaintiff was extremely vocal in court relaying that she said did not use
   methamphetamine.
   e. The court remove all physical and legal custody from Plaintiff based on the
   results of this drug test
   f. Adult probation filled out a "lab results" exhibit as an "official report" though
   they are not legally allowed to do so per state law.
   g. Plaintiff contacted adult probation, confident that the lab tests would come
   back negative, only to discover that her urine screen was negligently
   thrown away instead of being sent out for confirmation testing.
6) The following morning, October 6th, after Plaintiff read the rules of civil procedure
to the court showing the custody order was not legal, Intervenors call the police
to have Plaintiff evicted, however the officer informs them that he can't simply
"arrest someone for no reason."  Grandfather drives to the courthouse and files a
PFA immediately after and the PFA, where no abuse has even been alleged, is
granted SOLELY for the purpose of eviction and honorable judge Mincarelli
justifies this based on Plaintiff's drug screen. Not only is this drug test
inadmissible but the court should note that the Court grants a PFA due to the
positive drug test results and Plaintiff is evicted from her home where her

7

children reside.   The opposing party admitted under oath that Plaintiff has never committed any abuse nor threatened any abuse.  The court, the same judge as the day prior, grants this PFA on the basis of this positive drug test and Plaintiff was evicted from her home.

7) The very next day the court granted a PFA solely based on this positive drug test in a clear wrongful use of civil proceedings and abuse of judicial discretion in the absence of any allegations of abuse and simply to avoid having to go through an eviction process.

   a. The court blocks Plaintiff from arguing the law in a special relief hearing that takes over 3 months to have heard and orders a supervisor that cannot accommodate Plaintiff and the honorable Judge Rovio claimed she cannot lift supervision as she did not order it; however, the judge who ordered it is no longer a judge.

   b. Plaintiffs three hair follicle tests were refused in family court but accepted in criminal court even after authentication and chain of custody had been submitted.

   c. Plaintiff has been denied any legal counsel by the court despite removing all legal and physical custody from Plaintiff in the absence of abuse, abandonment and neglect and without ever commencing dependency proceedings.

   d.  It has been 7 months since Plaintiff has seen her children due to the continued poorly thought-out orders that allow the opposing party to find loopholes inventing a Plaintiff to see her children.

   e.

8) Plaintiff contacted adult probation on Oct 9th requesting than results from the urine sent for required confirmation testing.  Plaintiffs results from Wurst diagnostics finally posted as there was a delay in the results due to an initial raise positive test required additional testing.  Plaintiff believed the same would occur once the results came back from the lab in which her sample was sent by adult probation.  Plaintiff is told the that the head of adult probation threw out the test and never sent it out to a lab.

9) The head of adult probation entered "results" into evidence of a positive screen described as an "official report" in court.

10) Plaintiff  contacted adult probation October 9th seeking the laboratory results as she had had a urine screen conducted at Quest the day prior with the results bring heck up do to a false positive and had received the final results and believed the lab adult probation  used would have the same conclusion, Hoover Plaintiff was informed her urine screen was negligently thrown out and a "lab report " was entered by adult probation.

11) On October 19th, 2023, the court grants a final PFA order "on the basis of the events of October 5th (the drug test is the only thing that happened on Oct 5th). "as well as the positive drug screen (redundant but very clear) the reason for granting the PFA."

12) Plaintiff filed a special relief on January 24, 2024, that was not heard until April 9th, 2024. She prepared an argument of all of the laws of drug testing however Plaintiff was ignored by the court. Plaintiff prepared 2 arguments:

   A)    From what he scientific perspective, quoting the drug test manufacture's statement printed on every drug test stating the test must undergo confirmation testing, should not require an expert witness.

   B) From a legal perspective, Plaintiff quoting Pennsylvania law and federal law should not require an expert witness as this was required to be allowed to cite black law and case law in court. However, both of these arguments were barred from being heard due to Plaintiff's lack of expert witness.


Again, on October 19th the court grants a final order by an entirely different judge that granted the PFA order based on the results of this drug test. Plaintiff again avers the test's admissibility at this hearing, and it should not be a reason for a PFA order, however the PFA is granted as a final order for this reason. Plaintiff is permanently evicted from her residence where her children live. Additionally, the court stated in the beginning of the hearing, prior to hearing any testimony, that it's not unreasonable for Grandparents to want sole possession of their home. At the end of the hearing the court grants the PFA based on "the events that took place on October 5th" (the day of the drug test) "as well as the positive methamphetamine test" which is the same thing. As a result of this inadmissible drug test being used to remove her children and to grant an unlawful PFA, Plaintiff was arrested on an ICC violation for the PFA for informing the other party they were in contempt by refusing her visitation for the third consecutive weekend. No threats other then the threat of filing contempt was ever averred. Plaintiff spent 40 hours in jail and hurt her back in transport and could not walk for 3 days.

Plaintiff **was not allowed to participate in her children education**, see her children, visit them, was **rendered homeless** through eviction and was arrested due to this PFA all for her informing the other party that if they denied her visit with her children again, she would file contempt charges. She was **unlawfully incarcerated** handcuffed outside her house in front of the neighbored for hours and transported to a police station for 4 hours, was stripped searched and searched in Burlington country jail and transported again to Atlantic country jail where she was processed and searched again and was given no food or water for 40 hours. Plaintiff is currently facing criminal charges for this ICC violation despite two judges making it clear that this matter should

be over as Plaintiff provided a psychological evaluation, 3 hair follicle tests- one showing her prescribed medication present and the other two showing no substances present,  3 drug and alcohol evaluations all denying her any drug and alcohol treatment based on her not having a substance abuse disorder (and negative drug screen results) and this PFA order expired in April and is still beginning drug out until September 2024. In addition to the inadmissible drug screen that has been used against Plaintiff not being sent out for confirmation testing, Plaintiff would like the court to note that she was given an expired drug test as the shelf life of these does not extend past 2 years and adult probation has not given instant drug screen tests since 2018.  This drug screen was given at the end of 2023, over 5 years later.

Adult probation tells the court that this is a "field" test however does not inform that court this test is not admissible and gives testimony that nothing else could cause a positive result other than methamphetamine despite this begin scientifically untrue.

Plaintiff provided the court a written letter from a medical review officer that has also been ignored by the court where he states the admissibility in drug screening and the necessity of confirmation testing and avers that the court is well aware of this as it is in Pa law.

Plaintiff filed a Motion to Strike the drug test which was denied in July 2024.

 Plaintiff avers that no expert's testimony is necessary for her to cite Pennsylvania law as this bars anyone from self-representing in court and is contrary to federal and state law. The court refused her evidence and did not allow her to even cite law.


The elements of a 1983 claim

In order to prevail on a § 1983 claim against the defendant [*name of individual defendant*], the Plaintiff must prove each of the following elements by a preponderance of the evidence:


1.     the defendant acted under color of state law; and
2.     the [act[s]] [failure to act] of the defendant deprived the Plaintiff of particular rights under [the laws of the United States] [the United States Constitution] as explained in later instructions; and
3.     The defendant's conduct was an actual cause of the claimed injury.


A person acts "under color of state law" when the person acts or purports to act in the performance of official duties under any state, county, or municipal law, ordinance or regulation. [[The parties have stipulated] [I instruct you] that the defendant acted under color of state law.]

A judge or court master or the head if adult probation are all individuals who meet this criterion.

"If you find the Plaintiff has proved each of these elements, and if you find that the Plaintiff has proved all the elements the Plaintiff is required to prove under Instruction[s] [*specify the instruction[s] that deal with the particular right[s]*], your verdict should be for the Plaintiff.  If, on the other hand, you find that the Plaintiff has failed to prove any one or more of these elements, your verdict should be for the defendant."

**Actions of the numerous employees of the country that combine prove this is clearly a county policy or law:**

1) Forcing a drug test that Plaintiff never agreed to (Court admin and adult probation)
2) Using the results of an instant drug screen and entering an official report on this test into evidence. (Head of adult probation, Chris Pawlowski)
3) Throwing away Plaintiffs urine screen without sending it out for confirmation testing and submitted an "official report" on record (Chris Pawlowski)
4) These results then were used as "proof" as to why children were removed form BOTH parents- all legal and physical custody (although Father's came back negative.) (Judge Mincarelli)
5) Used these results to grant an emergency PFA order.  (Judge Mincarelli)
6) Used these results as the reason for granting a permanent PFA order (Judge Rovito)
7) Denied Plaintiff the ability to argue law over this test and her legal arguments refused to be heard (Judge Rovito) without an expert witness.
8) Denied Plaintiff's motion to strike denied (Judge Ryan)
9) Refused to lift supervised visitation (Judge Ryan) and the ONLY reason toward the denial of Plaintiff seeing her children for what 7 months will be based on this order that egregiously violates Plaintiff's rights as a parent is SOLELY hinged on this expired instant drug screen.

## Legal claim:

The court has acted under the color of law in

1) Inhibiting Parents' right to appeal the unlawful legal custody order that was then unable to appealed as there was no trial and a "review hearing" instead
2) For removing all legal and physical custody at first without any proof or cause
3) For then removing all legal and physical custody form Plaintiff for a clearly inadmissible drug test
4) For rendering Mothers homeless the very next day on a clearly unlawful PFA where no abuse was alleged.
5) For making the PFA final 2 weeks later solely based on the inadmissible drug test.

11

6) For placing a supervised visitation center that the court was well aware Mother could not afford and preventing all visits from March 3, 2024- at least Oct 20, 2024, in entirety.

**Plaintiff was rendered homeless, denied the ability to have her record expunged after waiting 4 years for the hearing, lost a job, and most importantly has lost her children she had not been able to see at all in the last 7 months. Additionally as a direct result of the unlawful abuse of discretion PFA that was granted solely on the basis of this drug test, Plaintiff was unlawfully incarcerated over informing the other party they were in contempt when they denied her from seeing her children for the 4th weekend in a tow,  Plaintiff was arrested and drug to 3 different locations in shackles and injured her back in transport.**

Plaintiff was bailed out in New Jersey on a future warrant because the judge found the claim too absurd to merit Plaintiff's stay in prison.  Plaintiff paid $100 bail that was never refunded.

Aside from the unlawful unconfirmed expired abc unsealed drug test entered into evidence, there was never any other drug and alcohol testing, or evaluations requested by the court.  No psychological evaluations ordered until a year after her children were removed despite no dependency proceedings commencing and curving Plaintiff to pay thousands of dollars all while approving forma pauperis applications determining she can not afford $90 filing fees.  If Plaintiff cannot afford $90, then his firs the court order $4,000 in evaluations go be paid for by Mother to see her children and why did the court wait over a year to order these?

There was a single instant urine screen conducted on October 5th, 2023, and it is the only incident the court had toward any wrongdoing or instability of Plaintiff.   The day after the drug test, the court granted a PFA against Plaintiff for the instant drug test.  See transcript.  The final PFA hearing, the same.  Plaintiff already had all legal and physical custody taken from her prior to the PFA- the day prior, so it cannot be a contributing factor as to the cause of removing all legal and physical custody from both parents, who do not reside together, on the same day.  Chester County itself has proven that its policy is to allow unconfirmed urine screens deemed admissible in court

 **What other possible explanation can one surmise from this sequence of events involving the head of adult probation and no less than three judges all ruling in this fashion?**  There are five actors of the court and three judges all ruling toward the legitimacy of this procedure of drug testing within this county which lays the claim that the County itself has a policy of allowing unconfirmed instant drug screens to be admissible in court.

As such, Plaintiff avers that the county is therefore liable for the violation of Plaintiffs constitutional rights being violated and subject to the maximum penalty of $500,000 allowed in such a violation.

The precedence of tort claims toward instant urine screens resulting in even a CYS investigation is established at $3,000/ day.  Plaintiff has had her children removed entirely from her care for over a year and the court has refused to order visitation with a any of mothers supervisors and instead has placed supervisors that are unable of unwilling to provide this service on the order and refused to find the Intervenors in contempt over preventing such visits as the court determined that the Intervenors see not in contempt for denying visits because the order was evidently so unclear that they were not in willful contempt for disobeying it.  As the court had determined this, it is once again the fault if the municipality as mother's mandated minimum visitation if 2 visits pet month- that the Municipality is responsible for paying- have been denied. Mother was ordered to 6 hours of visitation weekly meaning. She has been entitled to 318 hours of visitation. Mother has only here able to see her children a total of 17 hours. Mother avers that if residents of this municipality had to babe a price to prevent having their children taken away without cause for an entitle year and denied seeing them for 7 months, it would be a number so high that it would bankrupt this very state.  Plaintiff is entitled to far more than the mandated maximum for what this County's policies have cost her.

There are three judges and the head of adult probation and court administration, (Suzy Marker) that have all determined that drug screens are admissible in court, as such this would be considered a county policy.

**One would have to assume an overwhelming bias and grand conspiracy if this is not the policy of the municipality as there are an overwhelming number of judges, admin of the court, and even the head of adult probation who would have all had to decide to act against the law if it was not.**

Plaintiff avers that her rights of equal protection again were violated by the county's policy.

Plaintiffs assert claims against Chester County. Local governments can be liable as "persons" under § 1983, however, this liability extends only to "their own illegal acts." Connick v. Thompson, 563 U.S. 51, 60 (2011) (emphasis in original) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986)); see Monell, 436 U.S. at 665-83. This limitation is based on the well-established principle that municipalities "are not vicariously liable under § 1983 for their employees' actions." Connick, 563 U.S. at 60; Monell, 436 U.S. at 691 ("[A] municipality cannot be held liable solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a respondent superior theory.").

 A municipality cannot be held liable under § 1983 on a respondent superior theory; rather, **liability will be imposed when the municipality implements an official**

**policy that is either unconstitutional on its face or is the moving force behind the constitutional tort of one of its employees**.    42 U.S.C.A. § 1983.

Plaintiff alleges that Defendant's are state actors who are liable for constitutional violations caused by a policy or custom in accordance with Monell v. Department of Social Services, 436 U.S. 658 (1978). See also Est. of Roman v. City of Newark, 914 F.3d 789, 798-99 (3d Cir. 2019).

Rather, to plead a basis for liability against a municipal entity such as Chester County under § 1983, a Plaintiff must allege that the municipality's policy or custom caused the violation of his constitutional rights. See Monell, 436 U.S. at 69. "To satisfy the pleading standard, [the Plaintiff] must ... specify what exactly that custom or policy was." McTernan v. City of York, Pa., 564 F.3d 636, 658 (3d Cir. 2009). " 'Policy is made when a decision-maker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict.' " Estate of Roman v. City of Newark, 914 F.3d 789, 798 (3d Cir. 2019) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)).

*Defendants " 'cannot be held liable solely because [they] employ[ ] a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondent superior theory.' " Robinson v. Fair Acres Geriatric Ctr., 722 F. App'x 194, 197-98 (3d Cir. 2018) (quoting Monell, 436 U.S. at 691) (emphasis in original). Thus, the alleged violation of rights must have been caused by actions that were taken pursuant to a municipal "policy" or "custom." See id. at 198 (citing Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 583-84 (3d Cir. 2003)); see also Monell, 436 U.S. at 690-94. Liability is imposed "when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the 'moving force' behind the constitutional tort of one of its employees." Colburn v. Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991) (quoting Polk Cnty. v. Dodson, 454 U.S. 312, 326 (1981)).*

 As this matter has been repeatedly ruled by a plethora of judges, court admins, and the head of adult probation testifying and submitting "evidence" of an "official report", it is CLEARLY a policy of the municipality to allow unconfirmed drug tests to be used against someone in family court.

There are truly no alternatives to this theory other than a wide- spread conspiracy involving ALL OF these individuals all rugging contrary to law, or it's a policy of the County?

What could possibly be the municipalities excuse?  That all of their judges are incompetent and rule contrary to law on this matter?  That they are corrupt?  Or is this clearly County policy and as such the Municipality is liable for this civil rights violation that if this was ANY other individual or company, Plaintiff would have been able to sue them into bankruptcy Plaintiff has met all criteria to bring a suit against this municipality however the county has denied her complaint as having no merit when she filed 6

14

months ago.  It is unfortunate that Plaintiff is limited to the $500,000 toward this municipality as the damages are worth far more.

Plaintiff has gone before 6 judges in Chester County in the last year and all have made their decisions based on this instant drug screen in some manner.

As there is now a court ruling that waves any doubt toward the ruling, showing that it has forced supervised visitation onto M other based on this single unconfirmed drug test while requiring her have $3,925 in evaluations and drug testing- after she has already forced into $5,000 of debt in addition the $14,000 she has paid in legal services thus far, going into sever debt- all due to the court's violation of Plaintiff's civil rights. This violation is solely hinged on the single illegally obtained without consent, expired, unconfirmed drug test drug.  This is despite Plaintiff vehemently denying the validity in court the day of the test, the court acknowledging her disagreement with results as the transcript reflects, and then throwing away her urine screen despite her objections and denial of its accuracy.  In any other scenario Plaintiff would be awarded millions.  Her two small children have been ripped form her care, she has been denied holding them for a year, denied all contact for 7 consecutive months and in the lastly 13 months she has been allowed to spend 17 hours with them in a dirty awful visitation center with women yelling at them over asking their mom to take them to the bathroom.

The municipality can never give back what it took away from Plaintiff.

The municipality has ignored and the psych evaluation she already had completed and the three drug and alcohol evaluations she had completed, and paying for the authenticated results from LabCorp and the chain of custody from LabCorp (all of which is still ignored by the court without providing any reason) has a policy that allows unconfirmed drug tests to be used in court?   Plaintiffs Motions objected by several judges; it is unreasonable to believe so many would ignore this matter if it were not the practice of county laws to do so.

Plaintiff demands strict proof to the alternative in the response to this complaint.

## *Due process in taking legal and physical custody away from parents.*

Due process is a mandatory set of procedures required by the U.S. Constitution entitling citizens whose fundamental rights are implicated to consistent and fair treatment. Mandatory fair procedures include at a very minimum:

1. Express notice of the accusation.
2. A pre-deprivation hearing.
3. The right to confront witnesses.

15

4.  An evidentiary standard that is constitutionally compliant. And the least restrictive means to obtain a satisfactory solution

Substantive equal protection: similarly situated parents must be treated similarly (fundamental rights strand of equal protection under the fourteenth amendment.) State implication of a fundamental right resulting in the arbitrary classification of parents into suspect classes (non-custodial and custodial) is subject to constitutional review. Whenever government action seriously burdens fundamental rights and interests, heightened scrutiny of the procedures is warranted.

No statutory scheme contains a constitutionally compliant evidentiary standard. "Clear and convincing" evidence (of parental unsuitability) is the highest evidentiary standard in civil law that meets constitutional scrutiny pursuant to Santosky v. Kramer, 455 U.S. 745 (1982).Statutes expressly written which diminish parents' fundamental rights, are not constitutionally compliant, and therefore do not meet strict scrutiny under federal law. Conclusion: Where both parents' rights are diminished under state law, there is no set of circumstances that a constitutional outcome can ever be achieved. Ergo as there is no law capable of doing such, the court has acted under the color of law by defying such laws when doing so.

Where a state law impinges upon a fundamental right secured by the U.S. Constitution it is presumptively unconstitutional. Harris v. Mcrae, 448 U.S. 297 (1980); Zablocki v. Redhail, 434 U.S. 374 (1978). Conclusion: where a statutory classification significantly interferes with the exercise of a fundamental right, constitutional scrutiny of state procedures is required.

The parties to this case have deprived Mother, Plaintiff, her Constitutional rights and stole something more precious than any property.   No state nor judge has ever determined that either parent was unfit.  The state has not given any remedy or reunification plan.  Parents have tried every effort to obtain counsel and have been denied by legal aid and Plaintiff is petitioning this court for help. Plaintiff  has had all her money stolen by these individuals and has had to sift through the lies and piece to together what she could and discovered the clear evidence that Grandmother went to lengths of defrauding the federal government and committed grand theft and embezzlement not because she needed money but simply to ensure Mother had no options then to stuck in the abuse they would subject her to over the next 3 years.. They have stolen $50,000 from her, lied on court documents and misused civil proceedings that had prevented her from a job that could have supported herself and the children through their fraud.  The court is not equally liable, it is more liable as the court has granted fraudulent standing, denied every aspect to appeal this, has prevented any counsel being awarded, and has denied all rights to a Mother when

16

removing her children in entirely and also violating Mother's constitutional right toward being involved in her child's education as the COURT said Mother was unable to attend school functions due to Mother's supervised visitation, showing the court knowingly and purposefully removed this constitutional right from Mother by instilling supervised visitation when there was no abuse whatsoever even alleged.  In addition to preventing her from being allowed to participate in her children education, they have slandered her name, stolen and alienated her kids, financially, psychologically and mentally abused her for 3 years, rendered her homeless, and has prevented visitation with her children in entirely over the last 7 months.

Plaintiff was arrested for telling the fraudulent intervenors they could not continue to deny her visitation with her children and Plaintiff has been on bail for over 6 months from a fraudulent PFA in which mother's appeal disappeared form prothonotary and her appeal nunc pro tunc denied.  Plaintiff has been assaulted, falsely imprisoned by intervenors, actually imprisoned by this court, Plaintiff's children taken from her.  She has been illegally evicted, slandered, falsely accused, broken and beaten by this court for over 3 years. Everyone said what am amazing mom Plaintiff was prior to 2020. Everyone- even the intervenors never said anything negative or eluded toward Mothers inability to parent tat any time.  Mother has years of text messages and there is not a single negative text toward Mother's ability to parent.  How could the intervenors ever be granted legal custody if the intervenors never texted a single concern about Mother in regard to how she parented?  How could she be left with the children for months at a time with the father out until after midnight several times a week and every weekend and the intervenors did not call to stop by for 2-3 months at a time- who would leave infants in her care if they ever believed she was unable to care for the kids?  The entire claim is ludicrous, and Mother brought this argument before the court in 2021 and it was ignored. but they were so selfish that they wanted to take Plaintiff's kids to use them for a social life and for purpose of saving their marriage by giving them purpose. These twisted monsters are willing to break the law and dare someone to do something about it in everything they file and every testimony they give.

**Parent's interest in custody of their children is a liberty interest which has received considerable constitutional protection; a parent who is deprived of custody of his or her child, even though temporarily, suffers thereby grievous loss and such loss deserves extensive due process protection.** In the Interest of Cooper, 621 P 2d 437; 5 Kansas App Div 2d 584, (1980).

**The Due Process Clause of the Fourteenth Amendment requires that severance in the parent-child relationship caused by the state occur only with rigorous protections for individual liberty interests at stake.** Bell v. City of Milwaukee, 746 F 2d 1205; US Ct App 7th Cir WI, (1984).

17

Reality of private biases and possible injury they might inflict were impermissible considerations under the Equal Protection Clause of the 14th Amendment. Palmore v. Sidoti, 104 S Ct 1879; 466 US 429.

The United States Supreme Court noted that a parent's right to **"the companionship, care, custody and management of his or her children" is an interest "far more precious" than any property right.** May v. Anderson, 345 US 528, 533; 73 S Ct 840,843, (1952). **A parent's right to care and companionship of his or her children are so fundamental, as to be guaranteed protection under the First, Ninth, and Fourteenth Amendments of the United States Constitution.** in re: J.S. and C.,324 A 2d 90; supra 129 NJ Super, at 489. The Court stressed, **"the parent-child relationship is an important interest that undeniably Warrants deference and, absent a powerful countervailing interest, protection."** A parent's interest in the companionship, care, custody and management of his or her children rises to a constitutionally secured right, given the centrality of family life as the focus for personal meaning and responsibility. Stanley v. Illinois, 405 US 645, 651; 92 S Ct 1208, (1972).**Parent's rights have been recognized as being "essential to the orderly pursuit of happiness by free man."** Meyer v. Nebraska, 262 or 426 US 390; 43 S Ct 625, (1923).

The Constitution also protects **"the individual interest in avoiding disclosure of personal matters."** Federal Courts (and State Courts), under Griswold can protect, under the "life, liberty and pursuit of happiness" phrase of the Declaration of Independence, **the right of a man to enjoy the mutual care, company, love and affection of his children, and this cannot be taken away from him without due process of law. There is a family right to privacy which the state cannot invade or it becomes actionable for civil rights damages.** Griswold v. Connecticut, 381 US 479, (1965).

**The right of a parent not to be deprived of parental rights without a showing of fitness, abandonment or substantial neglect is so funda**

**In the area of child custody, principles of standing have been applied with particular scrupulousness because they serve a dual purpose: not only to protect the interest of the court system by assuring that actions are litigated by appropriate parties, but also to prevent intrusion into the protected domain of the family by those who are merely strangers, however well-meaning.  No. 1408 WDA 2014 Id. at 1318–19.**

**A third party cannot place herself in loco parentis "in defiance of the parents' wishes," Morgan, 923 A.2d at 1187 mental and basic as to rank among the rights contained in this 9th Amendment**

**Actions in defiance of the wishes of either natural parent will defeat in loco parentis status. B.A., 569 A.2d at 550. The consent of one parent to a parental role for the petitioner is insufficient. Id. at 551 (Nigro, J., concurring) ("The stakes are simply too high and the rights of the non- consenting parent too substantial to allow one parent to confer in loco parentis status on a third party.").**

**Under state & federal law parents are presumed to be suitable and fit parents. Parents, implicitly presumed to be suitable and fit, protect their child(ren)'s welfare. Conclusion: Suitable and fit parents act in their child(ren)'s best interests.**

The only way the State of Pennsylvania can rebut the presumption that fit parents are legally presumed to protect their child(ren)'s best interests is with a "compelling" reason. A compelling reason requires the State of Pennsylvania to intervene where the welfare of its minor citizens is in jeopardy. **If the State does step in, then it is at this point that state rights intersect with federal rights [and federal. rights require mandatory federal/constitutional protections]**. And pursuant to Article VI of the U.S. Constitution, the supremacy clause requires that "**the judges in every state shall be bound (by the Constitution and the laws of the United States)."**

Mother avers what the Municipality has done is vastly worse than the state stepping in for dependency proceedings- **the Municipality went against law and decided it could remove children and give all legal and physical custody to a third party who was never awarded any legal standing at the intervention hearing, denied all rights for parents to appeal, and has prevented all protections granted in a dependency proceeding.  The court has met the mandate of a color of law claim** toward kidnapping as there is no legal basis to remove children form parents without either parental consent or commencing dependency proceedings.   **Plaintiff's children as they were removed without cause for an entire year.   Further the court cannot possibly believe that it has acted in the children's best interest.**  The research on the extreme long tern damage that having parents ripped away form a child at the ages of Plaintiff's children is overwhelming**.**

The liberty interest of the family encompasses an interest in retaining custody of one's children and, thus, a state may not interfere with a parent's custodial rights absent due process protections. Langton v. Maloney, 527 F Supp 538, D.C. Conn. (1981).

*"Unless natural parents' prima facie right to custody is successfully overcome via dependency proceedings, the Superior Court cannot confer standing upon third parties to interfere with the parent/child relationship" (Cardamone v. Elshoff, 659 A.2d 575, 442 Pa.Super. 263, Super.1995. Child Custody)*

When Mother was contacted by child protective services initiated by Grandmother and Father, Mother spoke to the workers and begged them to take the case.  As they seemed surprised and said that Mother just needed to do what the court told her to do to get her kids back.  Mother relayed how the custody order lacks a reunification plan.  She case worker said that was not possible.  After reviewing this she said that I needed to go back to court because this order isn't legal.

Children were taken from parents who were never deemed unfit.  In fact, Judge Platt relayed the opposite saying, "no one is saying you're unfit.  I certainty never said you were unfit." What evidentiary hearing deemed parents as unfit?  What grounds would grandparents have on joining the order when Mother clearly disagreed with it and her counsel was so compromised with conflict of interest that its truly shameful that court has not acknowledged this still. It is self evident that the parties interests were adverse based on the correspondence between Mother and grandparents the day Mother saw the interferential and tried to leave with her kids and were threaten by Grandmother to have her kids be taken away if she did, grandmother's own journal entries, her emails to Laura Baker, the fact Laura Baker was paid by the opposing party who did not have Plaintiff's best interest Cheryl McCallin when Plaintiff  had her retained as her lawyer filed a motion for continuance saying the grandparents intended to intervene in custody and never provided me that document to date and Laura and Cheryl pretended this entire idea all came about due to the emergency hearing held after the motion was submitted and Mother signed a conflict waiver after Cheryl McClain had already written the intervention and Grandmother had begun emailing Plaintiff's hired council "her documents regarding "grandmother's role" in the children's care )(which coincidently proves perjury or defrauding the federal government)  the discuss their private discussions with Mother's lawyer and how she told them to not tell her client any information in the future and both attorneys are guilty of severe ethical recordings where grandparents violations.   Aside from colluding with lawyers and the extreme conflict of interest and Mother having worse than no counsel- she had counsel representing the opposing party while acting to be her representation all along.  A scheme that was planned months prior to the custody case beginning.

The court has placated known perjury by intervenors.

**Further damages and Recovery sought:**
1) **First and foremost, children should be returned immediately to parental care and the fraudulent third party removed.**
2) **The inadmissible drug test be stricken form record**
3) **Award damages in the sum of $500,000 for each party- Plaintiff and EACH of her two children.**

Plaintiff avers this case has substantial merit as her 14th amendment rights have been violated and it is clearly due to the unlawful policies of this municipality.   Every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party. Monell v. Department of Soc. Svcs., 436 U.S. 658 (1978). 42 U.S.C. § 1983 is a civil rights law that allows individuals to sue state and local officials for violating their federal constitutional rights:

42 U.S. Code § 1983 - Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. As Plaintiff is barred from bringing a claim against a judge or an individual's actions that have been directed by a judge, declaratory relief is unavailable.

Additionally, Plaintiff was ordered to pay for a visitation service in which the court is well aware she cannot afford as she has filed and ben granted forma pauperis on all files, To write an order that causes Mother to have to pay $90/hour to see her children when Mother does not have enough money to meet her basic needs as is, is a deprivation of rights.

If dependency proceedings had commenced as required by law, then Plaintiff would have a MINIMUM of 1 visit every other week, Plaintiff has been deprived  of all contact with her children for 7 consecutive months.

This case overwhelmingly meets all of the criteria for a 1983 claim as Mother's rights have been grossly violated by the unlawful practice of Chester County's laws and policies.

Under Section 1983, a government entity—such as a city or county—cannot be held indirectly responsible for its officers' actions.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).  But a government entity may be held directly responsible where a

policy, custom, or practice is the "moving force" behind a constitutional violation. A custom is a widespread practice, and a municipality may be sued directly for a custom that has caused the person's harm.  A person may prove the existence of a custom or informal policy by showing evidence of repeated constitutional violations.

Plaintiff filed a complaint Forma Pauperis, and it was denied on the basis of claim not having merit, however Plaintiff believes it is her right and in public interest for the county court to provide clarity in regard to something as important as the polices of drug testing in the county court removing children from parents and providing no means to litigate this for 14 months.  Plaintiff has been denied visitation for the last 5 months and was ordered at a center that was 60 miles form her home and then 89 miles from her home and charged $90/hour and then charged $100 for transport, $50 for a room reservation and $50/hour for the next supervision service located 64 miles from her home.  Mother has had 2 custody orders implemented since April that impeded any ability for Mother to see her children.

**Despite Mother not living within a reasonable distance of the supervision center, and Mother's proof she could not afford the supervision costs.  The court granted forma pauperis status for Mother's filings recognizing she could not afford a $90 filing fee while refusing to accept any reasonable supervisor for mother- including someone who used to be employed by this county to supervise visitation.   The court refused to remove the illegal and unwarranted supervision that was put in place, grant supervision with a reasonable distance from Plaintiff as required by statue.  The Magistrate refused to modify this unless the intervenors consented, refused to fund the supervision for Plaintiffs visits knowing she could not afford it, failed to find intervenors in contempt for denying 70% of Mother's visits, and have produced two orders over the last 7 months that denied Mother visitation from her children in entirety.**

Mother never placed her children into a dangerous situation, never abused them nor was any allegation made toward this.  The sole reason for supervision was a single unconfirmed drug test that the court refused to review the plethora of evidence proving this was a false positive costing Mother several thousands of dollars in testing and $200 in authentication and has still been ignored to this day.

Mother was unable to afford the $90/ hour supervision fees imposed and despite Mother filing a plethora of motions/ petitions the court has negligently not accommodated visitation and had ideally stood by while blocking any ability for Mother to see her children AT ALL FOR SEVEN CONSECUTIVE MONTHS.

     a. **As the LEGAL MINIMUM 2 visits per month are to be MANDATED by the court for ANYONE and when an individual cannot afford to pay for a supervisor, it is the County's responsibility to pay the cost of**

> **this supervision.  T**he County failed to do so.  Currently Plaintiff has not
> seen her children in 7 months due to the tactics of the intervenors and
> their counsel aggravating Kim Melhorn by canceling Mother's visitation
> stating they had a new supervisor, however the supervisor refused to be
> colloquized and there has been no supervisor since.

As of October 11th, 2024, Plaintiff had been denied all contact with her children for 7 months and 8 days.  Plaintiff seeks $1,000/ day/ per child for every day the court unlawfully has removed children from birth parents without any credible evidence, cause and 5,000/ fay Plaintiff is denied visitation with her children.

The county has ruled contrary to law in every aspect of her custody case and both parent's preliminary objections have been denied being heard for the last 3 years despite numerous filing and a plethora of evidence and proof of errors of law and errors of the case history repeated within this case.  Parents have been sued by the people who have stolen their children for filing the preliminary objections that the court has refused to ever hear.

This is a matter that should have been submitted to superior court if the court believed there was a question of law, however the court did not do so.

Further Plaintiff had an expert witness- a medical reviewed officer that under 1 week after the preliminary hearing where Plaintiff provided his name, she received as phone call from him relaying that he could not testify due to a conflict of interest that hospital administration had contacted him regarding as the county of Chester was a client.  He provided Plaintiff with a written letter in regard to drug testing to provide to the court as well and he could no longer discuss anything further in regards to why he was barred from testifying.

Plaintiff can provide over a dozen sections of Pa code that outline the specifics of admissible drug testing that all confirm how confirmation testing is necessary.  The state law that outlines who can provide evidence in the form of drug testing results has not changed for 70 years and the head of adult probation is not a state approved laboratory with calibrated instruments.   It is not feasible that this many well educated intelligent judges would all be unaware of the law or would all choose to disregard it, nor would the head of adult probation believe it was lawful to provide these results unless there is a county policy in doing so.  This is further proven by the template that adult probation clearly used that was already created where he could check boxes and submit his ""results" into evidence.  This was already pre created prior to Plaintiff providing a sample which proves the county has used this previously.  Plaintiff avers this is clearly unlawful and avers this unlawful practice has violated her constitutional rights.  Plaintiff is seeking the maximum award for damages toward a municipality in the amount of $250,000 for having her young children removed from her care and for begin unable to even see them for all but 15 hours in the last year due to the county's practice and policy.

As such Plaintiff avers this is "a loss."

The first step is to ascertain the loss the claimant has suffered due to this claim. The general rule is that the claimant may only recover for his/her own loss -The claimant does not need to be able to identify an exact amount of loss. The fact there is a loss at all is sufficient to satisfy this first requirement. The courts will attempt to quantify the loss no matter the difficulty. Alfred McAlpine Construction Ltd v Panatown Ltd [2001] 1 AC 518.

Plaintiff seeks the court to quantify what taking over a year of her children's lives away from her is worth. Her children were ages 4 and 7 when they were taken from her. They are now 5 and 8 and her youngest will be 6 before Plaintiff gets a trial.

As this county policy violates Plaintiff's constitutional rights, Plaintiff seeks monetary damages from the polices of Chester County that are clearly counter to every state in the entire country including Pennsylvania.

In Jan 2024 Plaintiff filed for special relief regarding:

A) Her children being removed from parent's care and no reunification plan.

B) Supervised visitation that was ordered where mother/ who lived off $950/ month was to pay $90/ hour to see her children 60miles and how it is clearly not reasonable to do so.

C) The laws regarding instant drug screens- over 50 pages- printed in quadruplet to provide the judge and other 2 parties. Mothers' legal argument was denied from being heard due to an expert witness not being present. Pro sec litigation then becomes impossible if a pro sec litigant is required to have a lawyer present to recite the law. Further the court made it abundantly clear that this drug test was legally permitted.

D) The opposing counsel discussed her intent to call Chris Pawlowski to testify to this drug screen despite the fact he holds no credentials or qualifications to testify in this matter. He is not an expert in toxicology nor does he have an accredited lab that is calibrated daily as required to provide evidence in court.

E) Although Plaintiff/ Mother was prevented from arguing the chemistry behind these drug tests in court, the court allowed Chris Pawlowski to testify as an expert toward this test despite the fact he has no credentials to do so. He does not have a science degree nor is he a toxicologist. He has no background or education in biochemistry, pharmacology, toxicology, cell physiology, organic chemistry, nor does he have a medical license and yet he testified toward a fallacy- that the drug test provided would only test positive for methamphetamine. This is not accurate. Not only was an unauthorized expired test with no chain of custody forced upon Plaintiff but the employee of this county testifying as an expert, is incorrect when saying this. Pseudoephedrine and the Vicks vapor inhaler Mother had been using excessively to ward off congestion the last 4 days from the stress of this case

making her sick, will test positive for methamphetamine.  Once again, an employee of the county actions caused further harm and the policy of the county to allow someone unqualified to testify on something that he clearly has no advanced knowledge to do so, is quiet common within this County.

F)  In August of 2024 another judge denied the motion to strike this drug test despite it being legally inadmissible by all statue and law and then 3 weeks later refused to lift supervised visitation and has prevented all visits with her children over the last 9 weeks.  Not only was this one drug test stated as the sole cause of this but Plaintiff's admissible evidence from credible laboratories- three hair follicle tests with chain of custody and authentication, were refused by the court after Plaintiff submitted the authentication 6 days prior to ruling and then again filed them in prothonotary immediately after the order came out. These were denied, but the inadmissible unconfirmed expired and illegal drug test without any chain of custody permission form Plaintiff  from adult probation, was accepted as the "only evidence" the court had and is the sole reason the court has refused to lift supervision as it is the sole excuse the court has used to remove her children from her for an entire year.

G) On August 29th, 20 days after the hearing to lift supervision the court refused to do so, relying solely on this drug test as the reason and denying all of mother's expensive past drug test.  Additionally, the court, knowing Mother cannot afford the supervision costs that were previously imposed, the court demand that Plaintiff complete $3,925 worth of evaluations when Plaintiff has paid over her annual income in court related costs in the last 6 months placing her in severe debt.  At this same hearing the court also ordered Plaintiff to pay $3,500 in legal fee reimbursement for the incredibly valid preliminary objections that Plaintiff filed regarding the illegitimate standing of the interventors that have been denied form a hearing for the last 3 years. The order reads

"Mother appeared at the hearing as a self-represented party and testified before the court. Prior to the hearing on Mother's Supervision Petitions, the court reviewed the record in this matter, which reflects that mother tested positive for methamphetamines in October, 2023. Mother testified that she has been in therapy with the same treating doctor for ten (10) years and does not pose a risk or threat to the Children. Other than her testimony, Mother did not introduce any evidence related to her current therapy or treatments needs. Although Mother admitted to past drug use, she challenged the validity of the recent drug test results. She testified that she was no longer using non-prescribed medications. During her testimony, Mother attempted to admit drug testing results from early 2024, all of which were inadmissible. Grandmother testified at the hearing as to

25

Mother's past drug use but did not present any evidence of present drug use……. Of utmost importance to the court is the safety and welfare of the Children.

Although Mother testified that she does not engage in illegal drug use, Mother's behavior at the hearing appeared erratic and at times, frenetic. The latest drug test results for Mother that are before the court are from October 2023 and were positive. The last psychological examination of Mother occurred in 2020. The court simply does not have enough credible information at this time to remove the required supervision from Mother's custodial time or to appoint Mr. Canal as the requested as a non-professional supervisor."

Mother provided a psych eval and the court should note that Mothers last court ordered psych eval did not pose any concerns and Plaintiff/Mother provided letters form her treating psychiatrist of 12 years for the diagnosis of ADHD and anxiety- included letter noting that Plaintiff had brought her children into sessions previously  and she interacted entirely appropriate with the kids and further he has no safety concerns for her ability to parents her kids.  Additionally, this same psychiatrist ordered a drug screen for Plaintiff when this case began in 2020 that Mother provided to the court in 2020 that showed she was not on drugs at that time as well.  Also, the court should note that all of these tests have been excepted in criminal court for the ICC violation for the false POFA that Mother has been denied appealing by this same court when the commonwealth court approved her appeal nunc pro tunc and transferred it to superior court prior to the country dismissing her appeal. *If CYS was to do this and rely on an instant urine screen, then CYS would surely be sued. There are numerous examples of this occurring.  As the court has refused to use CYS and to commence dependency proceedings in this case, the municipality and it's unethical and illegal laws and practices are clearly to blame for this gross violating of Plaintiffs constitutional rights begin violated.

H) Legal aid refused to take Plaintiff's case unless she completed a drug and alcohol program, however despite Plaintiffs efforts, all three of the places she went to concluded she did not meet the criteria of a substance abuse disorder and after providing clean urine screens;  they denied her all services.

I) Plaintiff was denied form all three after being drug tested and providing clean urine screens.   Plaintiff filed a motion to strike in July 2024 to strike the drug test.  Now again on August 28th, the Court refused to accept Mother's hair follicle test with authentication and chain of custody and determined that the instant field test superseded this test despite the authentication.  The Court refused to lift supervised visitation with the only cause provided as this legally in admissible drug test that the County policy.

As such Plaintiff/ Mother  has also been denied the ability to see her children at all for over 7 consecutive months when the county refused to commence dependency proceedings, has violated mother's rights, and has proven numerous times that the county has a policy to accept unconfirmed drug tests into evidence and to weigh that evidence over confirmed approved government lab results and to grant an unlawful PFA for said drug test.  The court has refused to strike this drug test and has written an order that clearly conveys the only evidence against Plaintiff/Mother is this inadmissible drug test.  The court, knowing Plaintiff cannot pay for a $90 appeal, orders Plaintiff to pay $3,500 to the opposing party for filing overwhelmingly valid preliminary objections while denying this from being heard by the court for the 4th time in 4 years, never allowing a hearing for the preliminary objections attempting to conceal the compote corruption that's occurred within this court.  The court then orders Plaintiff to pay an additional $3,925 in further testing in evaluations after approving 3 forma pauperis applications and acknowledging that Plaintiff was unable to afford her visitation that were unlawfully ordered at $90/hour.

The municipality has determined numerous times that it can defy the state laws and give custody to a third party without commencing dependency proceedings when no abuse, abandonment, neglect, or consent was ever alleged and deny a trial for 14 months and provide no reunification plan or assign counsel to Plaintiff.    These policies and the pain and suffering endured on not only Plaintiff/ Mother, but her children are entitled to damages.

There are additional concerns of corruption as Plaintiff has been informed that the opposing party accidently pocket dialed another party in the custody case and discussed several crimes between each other unknowingly being listened to for 20minutes.  They discussed their crimes between each other of their intent to destroy subpoenaed evidence and amongst other things, judicial tampering.   Just prior to the third party taking all legal and physical custody from both parents on the same day by a court master who gave them legal custody when they were never granted legal standing, ruled on a petition for special relief that can not be heard by a court master, the opposing party has a sizable calling of money sent to a foreign untraceable account. Between the confession and this coincidence, Plaintiff has reasonable cause for suspicion of corruption within the court.  This was money sent for the purpose of corrupting this custody case to ensure a favorable and illegal ruling.
At some point between March and June, Plaintiff filed a complaint against the municipality forma pauperis which was denied due to lack of merit.  Plaintiff has no way of recovering a copy of this to her knowledge as it has disappeared from the efile system, however this is further another example of the Municipality covering up its actions.

Plaintiff, Mother seeks the amount of $500,000 for each individual in her immediate family that was harmed by the Municipalities violation of her civil rights.  Plaintiff seeks $500,000 for herself, $500,000 for her oldest child (S.J.H.) and $500,000 for her youngest child (V.R.H.) as they are also victims of the court's violations.

**U.S. v. Throckmorton, 98 US 61 WHEREAS, officials and even judges have no immunity** See, Owen vs. City of Independence, 100 S Ct. 1398; Maine vs. Thiboutot, 100 S. Ct. 2502; and Hafer vs. Melo, 502 U.S. 21; o**fficials and judges are deemed to know the law and sworn to uphold the law; officials and judges cannot claim to act in good faith in willful deprivation of law, they certainly cannot plead ignorance of the law, even the Citizen cannot plead ignorance of the law, the courts have ruled there is no such thing as ignorance of the law .**Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401 (1958) **"No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it.**

**Under the color of law as described in detail above, Plaintiff's constitutional rights under that her constitutional rights under Article 1, 9, and 11 have been violated as described in detail.**

**Article 1.  Inherent rights of mankind.**

1) All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

**§ 9.  Right of appeal.**
There shall be a right of appeal in all cases to a court of record from a court not of record; and there shall also be a right of appeal from a court of record or from an administrative agency to a court of record or to an appellate court, the selection of such court to be as provided by law; and there shall be such other rights of appeal as may be provided by law.

**§ 11.  Courts to be open; suits against the Commonwealth.**
All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

As such, Plaintiff seeks the court and municipality to return Plaintiffs children immediately, award damages to Plaintiff, and to modify its practices and laws to conform to the statue and laws of the state of

Pennsylvania as well as to cease all practices that oppose the laws of the United states of America.

actor may be deemed to have caused a constitutional violation under the "integral-participant doctrine," "only if (1) the defendant knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation, or (2) the defendant set in motion a series of acts by others which the defendant knew or reasonably should have known would cause others to inflict the constitutional injury." *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022); *see id.* at 889-92

The elements of a § 1983 claim are (1) the action the action was committed by a person acting "under color of state law" and (2) the action resulted in the deprivation of a constitutional right or federal statutory right. *Ochoa v. Pub. Consulting Grp., Inc.*, 48 F.4th 1102, 1107 (9th Cir. 2022) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).  In order to be individually liable under § 1983, an individual must personally participate in an alleged rights deprivation.  *Avalos v. Baca*, 596 F.3d 583, 587 (9th Cir. 2010).

In a § 1983 action, the Plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Bearchild v. Cobban*, 947 F.3d 1130, 1150 (9th Cir. 2020) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008).  "To meet this causation requirement, the Plaintiff must establish both causation-in-fact and proximate causation."  *Id.; see also Chaudhry v. Aragon*, 68 F.4th 1161, 1169 nn.11-12 (9th Cir. 2023) (defining causation-in-fact and proximate causation).

In *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941-42 (9th Cir. 2020), the Ninth Circuit discussed, for the first time, the minimum level of involvement needed for § 1983 liability under the integral-participant doctrine.  An actor may be deemed to have caused a constitutional violation under the "integral-participant doctrine," "only if (1) the defendant knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation, or (2) the defendant set in motion a series of acts by others which the defendant knew or reasonably should have known would cause others to inflict the constitutional injury."  *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022); *see id.* at 889-92 (holding that when non shooting officers did not form plan with shooting officers to shoot suspect, did not set in motion acts by shooting officers, and did not know or should have known constitutional violation would occur, non-shooting officers were not integral

participants in constitutional violation).  When liability is alleged against a defendant on this basis, the model instruction stated above will need to be modified.

In the area of child custody, principles of standing have been applied with particular scrupulousness because they serve a dual purpose: not only to protect the interest of the court system by assuring that actions are litigated by appropriate parties, but also to prevent intrusion into the protected domain of the family by those who are merely strangers, however well-meaning. No. 1408 WDA 2014 Id. at 1318–19.

A third party cannot place herself in loco parentis "in defiance of the parents' wishes," Morgan, 923 A.2d at 1187

 Morgan  concluded a child's legal guardians never permitted petitioner "to assume parental status or discharge parental duties." Morgan, 923 A.2d at 1188. To the contrary, the evidence proves that Mother never agreed with their invention in any capacity and she was clearly lied to by counsel paid for and working for the intervenors. This is similar to Morgans acknowledged that the guardians' "long-standing opposition to [his] exercise of rights toward [child] have been hostile and aggressively absolute." Id. at 1189.

Actions in defiance of the wishes of either natural parent will defeat in loco parentis status. B.A., 569 A.2d at 550. The consent of one parent to a parental role for the petitioner is insufficient. Id. at 551 (Nigro, J., concurring) ("The stakes are simply too high and the rights of the non- consenting parent too substantial to allow one parent to confer in loco parentis status on a third party.").

Here we have neither parent ever agreeing with parental locus status and the opposing counsel claiming they have obtained this status. It was done so through fraud

This Court has stressed that "[t[he law simply cannot permit a third party to act contrary to the natural parent's wishes in obtaining custody and then benefit from that defiant conduct in a subsequent custody action." J.F., 897 A.2d at 1275-76.

The liberty interest of the family encompasses an interest in retaining custody of one's children and, thus, a state may not interfere with a parent's custodial rights absent due process protections. Langton v. Maloney, 527 F Supp 538, D.C. Conn. (1981).

Law and court procedures that are "fair on their faces" but administered "with an evil eye or a heavy hand" was discriminatory and violates the equal protection clause of the Fourteenth Amendment. Yick Wo v. Hopkins, 118 US *356,* (1886).

Parent's interest in custody of their children is a liberty interest which has received considerable constitutional protection; a parent who is deprived of custody of his or her child, even though temporarily, suffers thereby grievous loss and such loss deserves extensive due process protection. In the Interest of Cooper, 621 P 2d 437; *5* Kansas App Div 2d *584,* (1980).

The Due Process Clause of the Fourteenth Amendment requires that severance in the parent-child relationship caused by the state occur only with rigorous protections for individual liberty interests at stake. Bell v. City of Milwaukee, 746 F 2d 1205; US Ct App 7th Cir WI, (1984).

Constitution of Pennsyvania **ARTICLE I.  DECLARATION OF RIGHTS**

Article **1.  Inherent rights of mankind.**

    All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

ARTICLE I
DECLARATION OF RIGHTS

**§ 11.  Courts to be open; suits against the Commonwealth.**
   All courts shall be open; and every man for an injury done
him in his lands, goods, person or reputation shall have remedy
by due course of law, and right and justice administered without
sale, denial or delay. Suits may be brought against the
Commonwealth in such manner, in such courts and in such cases as
the Legislature may by law direct.
**§ 12.  Power of suspending laws.**
    No power of suspending laws shall be exercised unless by the

Legislature or by its authority.

## ARTICLE V.  THE JUDICIARY

**§ 9.  Right of appeal.**
   There shall be a right of appeal in all cases to a court of
record from a court not of record; and there shall also be a
right of appeal from a court of record or from an administrative
agency to a court of record or to an appellate court, the
selection of such court to be as provided by law; and there
shall be such other rights of appeal as may be provided by law.

Title 58

Chapter 15 # CHAPTER 15. PROHIBITED DRUG TESTING.

   **(d)  Test results admissible in evidence.--**In a **civil** proceeding arising out of a
violation of section 6502 or in a prosecution under section 6502, the amount of alcohol
or the presence of a controlled substance in the individual's blood as shown by chemical
testing, conducted by a qualified individual using approved equipment, of the individual's
breath, blood or urine shall be admissible in evidence. The following apply:

   (1)  Chemical tests of breath must be performed on devices approved by the
Department of Health using procedures prescribed jointly by regulations of the
Department of Health and the Department of Transportation. Devices must have been
calibrated and tested for accuracy within a period of time and in a manner specified by
regulations of the departments. For purposes of breath testing, a "qualified individual"
means an individual who has fulfilled the training requirement in the use of the
equipment in a training program approved by the departments. A certificate or log
showing that a device was calibrated and tested for accuracy and that the device was
accurate shall be presumptive evidence of those facts in every proceeding in which a
violation of this chapter is charged.

   (2)  (i)  Chemical tests of blood or urine, if conducted by a facility located in this
Commonwealth, must be performed by a clinical laboratory licensed and approved by
the Department of Health for this purpose using procedures and equipment prescribed
by the Department of Health or by a Pennsylvania State Police criminal laboratory. For
purposes of blood and urine testing, a "**qualified individual**" means an individual who
is authorized to perform those chemical tests under the act of September 26, 1951
(P.L.1539, No.389), known as The Clinical Laboratory Act.

(ii)  For purposes of blood and urine testing to determine blood alcohol or controlled substance content levels, the procedures and equipment prescribed by the Department of Health shall be reviewed within 120 days of the effective date of this subparagraph and at least every two years thereafter to ensure that consideration is given to scientific and technological advances so that testing conducted in accordance with the prescribed procedures utilizing the prescribed equipment will be as accurate and reliable as science and technology permit.

3)  Chemical tests of blood or urine, if conducted by a facility located outside this Commonwealth, must be performed:

(i)  by a facility licensed and approved by the Department of Health for this purpose; or

(ii)  by a facility licensed to conduct the tests by the state in which the facility is located and licensed pursuant to the Clinical Laboratory Improvement Amendments of 1988 (Public Law 100-578, 102 Stat. 2903).

## 37 Pa. Code § 451.113

§ 451.113. **Drug Testing** Program.

Currentness

(a) The board will approve and implement written policies and procedures for the **Drug Testing** Program.

(b) The **Drug Testing** Program policies and procedures shall include the following elements:

34

(1) The purposes of **testing**, that is, whether it is for rehabilitative or treatment purposes, for the protection of the community, for the use of the Court in sentencing or for the compilation of statistics.

(2) The manner of offender selection, that is, whether Court-ordered, randomly selected or applicable to eligible offenders.

(3) The frequency of **testing**.

(4) The chain-of-custody procedures.

(5) **Confirmation** procedures for positive **drug tests** through the use of a more sensitive procedure than used in initial screening and the rationale for use of the particular method selected.

(6) A description of **drug testing** methodologies.

(7) A policy regarding reporting and use of **testing** results.

(8) A confidentiality policy.

(9) Evaluation procedures.

(10) A monitoring component to ensure offenders' compliance with the conditions of the **Drug Testing** Program.

(11) Policy and procedure for responding to major and minor violations of **Drug Testing** Program conditions.

58 Pa. Code § 15.12

§ 15.12. Official form.

Currentness

The following official form is to be used in conjunction with this chapter: SAC:UDT-1 Urinalysis/**Drug** **Test** Consent Form.

SAC:UDT-1

**URINALYSIS/DRUG TEST CONSENT FORM**

Individual's Name

_____

Social Security Number

_____

Address

_____

_____

I hereby voluntarily submit a urine sample and authorize an approved laboratory to **test** such sample for the presence of a prohibited drug.

Such **test** will be performed by an approved laboratory designated by the Pennsylvania State Athletic Commission to conduct such **tests**. I hereby consent to the results of said **test** being released to the Pennsylvania State Athletic Commission. Since medications can affect **test** results, I have listed below all medications I have taken during the past ten (10) days (both over-the-counter and prescribed).

I understand that the failure to supply a urine sample, refusing to submit to a **test**, tampering with the sample or falsifying any information obtained in connection with this **test** will result in an immediate suspension of not less than ninety (90) days, a civil penalty of $100 and a forfeiture of any purses or prizes which have been earned from the day's event. I also understand that if the analysis of this urine sample results in a **confirmed** positive **test** result I will be suspended and a civil penalty imposed depending on whether I have had any prior **confirmed**-positive **test** results. I understand that I am

entitled to a hearing regarding any disciplinary action taken against me in accordance with the State Athletic Code.

 I agree to hold the Pennsylvania State Athletic Commission, its agents, directors, officers and employees harmless from any liability in connection with the ==drug test== conducted. I have noted any perceived irregularities in the collection procedures in the space provided below.

During the past ten (10) days, or at the present time, are you taking:

| | | |
|---|---|---|
| Over-the-counter medication | yes | no |
| Prescription medication | yes | no |

If "yes" to either question, please describe in detail below:

**Medication Last Taken Physician's Name, Address and Telephone Number**

_____

_____

_____

ANY PERCEIVED IRREGULARITIES IN THE COLLECTION PROCEDURES MUST BE NOTED BELOW:

_____

_____

_____

| | | |
|---|---|---|
| Signature of Boxer | Date | Time |
| Signature of Witness | Date | Time |
| Commission Representative | Date | Time |

 Averhealth filed its Motion for Summary Judgment. It denied owing any duty to Ms. Mack beyond the duty to reasonably collect and handle ==drug== testing samples, as established in *Sharpe v. St. Luke's Hosp.*, 821 A.2d 1215 (Pa. 2003). Averhealth also emphasized that it recommended ==Confirmation Testing== "[w]here an initial screen indicates substance use and the patient denies use." Mot. for Summ. J. at ¶ 37.

Indeed, the testing report for Ms. Mack's specimen expressly stated that, **Confirmation Testing** "should be completed on any positive results prior to **taking judicial, employment or similar action."** Mot. for Summ. J., Ex. B. at 50 (emphasis added).


317 A.3d 613 (Table)

Unpublished Disposition

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

Superior Court of Pennsylvania.

Jessica MACK, on her own behalf and on behalf of other similarly situated persons, Appellant

v.

AVERTEST, LLC d/b/a/ Averhealth

No. 372 EDA 2023
Filed March 22, 2024

In response, Ms. Mack argued that Averhealth owed her a duty and breached that duty. Ms. Mack's articulation of the duty has evolved over the course of this litigation. Currently, she seeks recognition of the following duty:

[A] duty to disclose the accuracy and limitations of a substance use screening **test** to an examinee submitting to a substance use **test** [and] to the Pennsylvania Courts enforcing probation depending on the outcome of the substance use **test**, when a more accurate (though less profitable) substance use **test** is available and the testing facility knows or should know that the more accurate **test** is not always administered to confirm substance use before an incarceration decision is made based on the outcome of the screening **test**.

Drug and alcohol testing mechanisms are not uniform, nor are they consistently reliable or accurate. One form of testing is clinical drug testing, most often performed on urine samples and the most prevalent form of screening (known as "urine drug

screening" or "UDS*). Moeller et al., Urine Drug Screening: Practical Guide for Clinicians, 45 Mayo Clinic Proceedings 66, 66 (2008). It is also the form of drug testing that was ordered on the Appellee in the instant matter.

A UDS is qualitative, meaning it establishes a presumption that a chemical compound is present in the bodily fluid, but it does not definitively prove it. Substance Abuse and Mental Health Services Administration, U.S. Dept. of Health and Human Services, Clinical Drug Testing in Primary Care (2012), https://store.samhsa.gov/system/files/smal2-4668.pdf. To determine whether a positive clinical result is accurate, a forensic test must be performed to confirm the result. Moeller et al., supra at 74 (" A confirmatory test (e.g. GC-MS) is required before decisions can be made on the basis of UDSs" and "It]he main disadvantage of immunoassays is obtaining false-positive results when detection of a drug in the same class requires a second test for confirmation.") As far back as the 1951, the National Bureau of Standards said clinical drug tests "should not be used as the sole evidence for the identification of a narcotic or drug of abuse." Ryan Gabrielson & Topher Sanders, Busted, Propublica, July 7, 2016.

and Yield of Drug Screening in the Emergency Department, 6 Am. J. of Emergency Med. 14, 19 (1987). See also Hugh J. Hansen et al., Crisis in Drug Testing: Results of CDC Blind Study, 253 J. Am. Med. Ass'n. 2382 (1985). Misleading and faulty results, also known as false positives, regularly occur in two situations: when the chemical compound is not present at all (in other words the result is simply wrong), or when the chemical compound is present but comes from a lawful source, like medication, but the test result does not make that distinction. Robert L. DuPont et al., Drug Testing: A White Paper of the American Society of Addiction Medicine 1, 6 (Oct. 26, 2013); Brahm, et al., Commonly Prescribed Medications and Potential False-Positive Urine Drug Screens, 67 Am. J. Health-Sys Pharm 1344, 1349 (Aug. 15, 2010) (" A number of routinely prescribed medications have been associated with triggering false positive UDS results.") For example, Venlafaxine, an anti-depressant, can lead to a positive result for PCP. Moeller et al., supra at 72-73. Consequently, UDS test results can be defective and should not be treated as concrete proof that one has used a particular substance.

Additionally, numerous instances demonstrate the risks of contamination in laboratories as well as the devastating consequences for those impacted by erroneous results. Mass. Lab Mishandling May Mean 1,140 Inmates Convicted Using Tainted Evidence. Report Says, CBS Boston, Sept. 25, 2012, https://www.cbsnews.com/news/mass-lab-mishandling-may-mean-1140- inmates-convicted-using-tainted-evidence-report-says/:Justin Zaremba, Lab Tech Allegedly Faked Result in Drug Case: 7.827 Criminal Cases Now in Question, NewJersey.com Mar. 2, 2016. For example, in 2015, an independent review of the

Mothers Laboratory at the Hospital for Sick Children in Toronto that had drug tested more than 24,000 hair samples for child welfare cases determined the regulta wars 66; inodeguoto ond unsolichlo 9 Trocioolle, thou hod

Drug and alcohol testing mechanisms are not uniform, nor are they consistently reliable or accurate. One form of testing is clinical drug testing, most often performed on urine samples and the most prevalent form of screening (known as "urine drug screening" or "UDS"). Moeller et al., Urine Drug Screening: Practical Guide for Clinicians, 45 Mayo Clinic Proceedings 66, 66 (2008). It is also the form of drug testing that was ordered on the Appellee in the instant matter. A UDS is qualitative, meaning it establishes a *presumption* that a chemical compound is present in the bodily fluid, but it does not definitively prove it. Substance Abuse and Mental Health Services Administration, U.S. Dept. of Health and Human Services, Clinical Drug Testing in Primary Care (2012), https://store.samhsa.gov/system/files/sma12-4668.pdf.  To determine whether a positive clinical result is accurate, a forensic test must be performed to confirm the result. Moeller et al., supra at 74 ("A confirmatory test (e.g. GC-MS) is required before decisions can be made on the basis of UDSs" and "[t]he main disadvantage of immunoassays is obtaining false-positive results when detection of a drug in the same class requires a second test for confirmation.") As far back as the 1970's, the National Bureau of Standards said clinical drug tests "should not be used as the sole evidence for the identification of a narcotic or drug of abuse." Ryan Gabrielson & Topher Sanders, Busted, Propublica, July 7, 2016.

Clinical drug tests can be inaccurate and imprecise. "[I]nvestigators have reported false-negative rates for urine screening of 30% and higher." Arthur L. Kellermann et al., Utilization

breathalyzer.html?smid=nytcore-ios-share; Jan Ransom, After False Drug Test, he Was in Solitary Confinement for 120 Days, Nov. 20, 2019, https://www.nytimes.com/2019/11/20/nyregion/prison-inmate-drug-testing-lawsuit.html. See also Schulte et al., Liquid Gold: Pain Doctors Soak Up Profits by Screening Urine for Drugs, Kaiser Health News (Nov. 6, 2017).

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

Chester county and the municipality of west Goshen

**(b)** County of Residence of First Listed Plaintiff   Mount Laurel, NJ
*(EXCEPT IN U.S. PLAINTIFF CASES)*

Burlington county, NJ

County of Residence of First Listed Defendant   The county of chester
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

pro sec Julia Karodosh
233 Starboard Way
JuliaKardosh

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question *(U.S. Government Not a Party)*
☒ 2 U.S. Government Defendant
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

Chester county and the municipality of west Goshen
Chester county and the municipality of west Goshen

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Product Liability | |     28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |     Liability    ☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &     Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
|    & Enforcement of Judgment |     Slander     Personal Injury | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted |     Liability    ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 470 Racketeer Influenced and |
|    Student Loans | ☐ 340 Marine     Injury Product | |     New Drug Application |     Corrupt Organizations |
|    (Excludes Veterans) | ☐ 345 Marine Product     Liability | | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment |     Liability    **PERSONAL PROPERTY** | | ☐ 880 Defend Trade Secrets |     (15 USC 1681 or 1692) |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle    ☐ 370 Other Fraud | **LABOR** |     Act of 2016 | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle    ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards | |     Protection Act |
| ☐ 190 Other Contract |     Product Liability    ☐ 380 Other Personal |     Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Property Damage | ☐ 720 Labor/Management | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise |     Injury    ☐ 385 Property Damage |     Relations | ☐ 862 Black Lung (923) |     Exchange |
| | ☐ 362 Personal Injury -     Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| |     Medical Malpractice | ☐ 751 Family and Medical | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** |     Leave Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights    **Habeas Corpus:** | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting    ☐ 463 Alien Detainee | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** |     Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment    ☐ 510 Motions to Vacate |     Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/     Sentence | |     or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability |     Accommodations    ☐ 530 General | | ☐ 871 IRS—Third Party |     Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 535 Death Penalty | **IMMIGRATION** |     26 USC 7609 |     Agency Decision |
| |     Employment    **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities -    ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | |     State Statutes |
| |     Other    ☐ 550 Civil Rights |     Actions | | |
| | ☐ 448 Education    ☐ 555 Prison Condition | | | |
| |    ☐ 560 Civil Detainee - | | | |
| |     Conditions of | | | |
| |     Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983

Brief description of cause:
My children have been taken from me for a year due to the county policy to accept unconfirmed instant drug tests as evidence in court

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
$500,000

CHECK YES only if demanded in complaint:

**JURY DEMAND:** ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE   Ryan    DOCKET NUMBER   2020- 05201-CU

DATE
10/30/2024

SIGNATURE OF ATTORNEY OF RECORD
Julia Kardosh

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.** **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.** **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.